UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

FILED
U.S. DIST COURT
MIDDLE DIST OF LA

2009 JUL -2  A 10: 15

SIGN_____
BY DEPUTY CLERK

LOUISIANA HEALTH SERVICE
& INDEMNITY COMPANY, d/b/a
BLUE CROSS and BLUE SHIELD
OF LOUISIANA

VERSUS

UNITED STATES OF AMERICA

CIVIL ACTION

NO. 05-914-JVP-DLD

## RULINGS AND ORDER

This matter is before the court on a motion by defendant, United States of America, for summary judgment (doc. 46), a cross motion for partial summary judgment by plaintiff, Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("BCBSLA") (doc. 49), and a motion by the defendant to strike evidence (doc. 51). All three motions are opposed. Jurisdiction is based upon 28 U.S.C. 1331. There is no need for oral argument and the matter is now submitted.

## FACTS AND PROCEDURAL HISTORY

Plaintiff, BCBSLA, claims that it is entitled to a refund of $4,555,247, plus interest thereon, for income taxes that it allegedly overpaid during the years, 1991 through 1994.

Pursuant to Section § 833(a) of the Tax Reform Act of 1986, Pub. L No. 99-514, § 1012, 100 Stat. 2085, 2390, BCBSLA became a taxable entity on January 1, 1987. BCBSLA also became subject to the fresh start basis transition rule ("Fresh

1

Start Basis Rule"). The Fresh Start Basis Rule provides that, "for purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of such taxable year shall be treated as equal to its fair market value as of such day." Tax Reform Act of 1986, § 1012 (c)(3)(A)(ii). BCBSLA maintains that, as of January 1, 1987– the applicable date of the Fresh Start Basis Rule– it held intangible assets in the form of its healthcare coverage contracts, healthcare provider contracts, and assembled workforce. Plaintiff further maintains that during the during the years, 1987 through 1991, many of those coverage contracts, provider contracts, and employee relationships were terminated, resulting in losses equal to the January 1, 1987, fair market value of each of those terminated assets.

BCBSLA did not originally claim those losses on its tax returns, but later filed timely claims for refunds, asserting that each of its claims satisfied the requirements of 26 U.S.C. § 165 (hereinafter, "I.R.C. § 165). The Internal Revenue Service, however, disagreed and refused to refund the overpayments claimed by BCBSLA. Accordingly, BCBSLA filed this action on June 29, 2005.

On January 16, 2009, defendant moved for summary judgment. Plaintiff responded on February 17, 2009, and filed its cross motion for partial summary judgment on two issues raised by the government's motion: (1) whether the Fresh Start Basis Rule applies to the losses claimed, and (2) whether BCBSLA made an unauthorized change in its method of accounting when it claimed the loss deductions.

Pursuant to LR. 56.1, defendant has submitted a statement of uncontested material facts in conjunction with its motion for summary judgment. The material responses to the statements of fact are noted in footnotes where appropriate.[1] The material facts submitted by defendant are as follows:[2]

1.    At all times relevant to this case, the plaintiff was a Louisiana non-profit corporation doing business as an independent licensee of the Blue Cross and Blue Shield Association. As of January 1, 1987, Louisiana Health Service became a taxable entity under Section 833(a) of the Internal Revenue Code.

2.    As a provider of health insurance, the plaintiff is party to healthcare coverage contracts with individual, employer, and group subscribers. As of January 1, 1987, the plaintiff was a party to approximately 132,000 group and individual contracts. These "subscriber contracts" obligate the plaintiff to pay the healthcare costs of each subscriber in exchange for the subscriber's payment of an insurance premium. The contracts were renewable annually, and terminated when either the group or individual did not renew the contract at the end of its term, or when the contract was otherwise cancelled.[3]

---

[1]LR 56.2 provides:

> Each copy of the papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule.

[2]Conclusions of law and obviously irrelevant facts submitted in connection with defendant's motion for summary judgment have been deleted so that the statement of material facts and the objections thereto, as reproduced herein, conform more closely to the requirements of Uniform Local Rules 56.1 & 56.2.

[3]Though plaintiff does not contest any material fact stated in ¶ 2, it states that, according to the Declaration of Roger Grabowski, as of January 1, 1987, BCBSLA specifically had 129,747 individual healthcare coverage contracts and 2,128 group healthcare coverage contracts for a total of 131,875 (doc. 48-2, ¶ 2).

3.   Plaintiff held contracts with providers of healthcare services: hospital provider contracts, hospital preferred provider organization contracts, and physician preferred provider contracts (collectively, "provider contracts"), to provide services to Louisiana Health Service subscribers on a percentage discount basis. As of January 1, 1987, the plaintiff was a party to approximately 970 provider contracts. These provider contracts were terminable at will by either the provider or Louisiana Health Service or, in the case of hospital providers, if the method for reimbursement was changed and a new contract needed to be drawn.

4.   Louisiana Health Service had an assembled workforce on January 1, 1987. Each employee relationship was terminable at will by either the employee or the plaintiff.

5.   In the ordinary course of its business, Louisiana Health Service incurred various expenses to induce potential customers to enter into healthcare service contracts, to maintain its provider network, and to recruit, train, and employ its workers.   Expenses included salaries and commissions, advertising, airplane maintenance, business meals and travel, postage, utilities, office supplies, taxes, and overhead. Louisiana Health Service did not purchase any subscriber contracts, provider contracts, or employees from another insurance company. Over the life of each of these intangible assets, Louisiana Health Service incurred additional expenses to keep the assets. Plaintiff has treated these as ordinary expenses, deductible in the year incurred, not as capital items expensed over the useful life of the asset.

6.   In or about March, 1996, Ernst & Young performed a valuation of Louisiana Health Service's intangible assets as of January 1, 1987, including its subscriber and provider contracts and assembled workforce. Prior to issuing its report, Ernst & Young made a presentation to Louisiana Health Service proposing the valuation as part of a tax strategy to claim loss deductions for terminated contracts and employee relationships.[4]

7.   On its corporate income tax returns for the years, 1987 and 1994, as originally filed, Louisiana Health Service claimed no loss deductions for terminated  subscriber  contracts,  provider  contracts,  or  employee

---

[4]Plaintiff generally admits this statement, but denies that the presentation proposed the valuation as part of a tax strategy (doc. 48-2, ¶ 6).

relationships.  It first claimed such loss deductions in May 1996, nearly ten years after the plaintiff became a taxable entity.

8.   Louisiana Health Service claimed a tax loss regarding a subscriber contract, not when a subscriber contract was terminated, but when the relationship with the subscriber or subscriber group ended, in other words, when there was no coverage of any sort for that individual or group through Louisiana Health Service.  It claimed a tax loss when a provider contract was cancelled.  It claimed a tax loss when an employee left its service.[5]

9.   On its original corporate income tax return for **1991** Louisiana Health Service claimed net losses from the sale of business property of $42,950 (line 9); reported total income of over $60 million (line 11); claimed $103 million in total deductions, $41 million of which were claimed net operating losses (lines 27, 29); and reported and paid tax due of $1,447,532 (line 31).

10.   On its amended income tax return for **1991** Louisiana Health Service claimed an increase in net losses for the sale of business property to $1,999,259 (Schedule 1, line 9); added claimed losses from the purported cancellation, termination, or abandonment of the intangible assets in issue of nearly $2 million (Schedule 21); reported total income of $60 million (line 11); claimed an additional $16 million in deductions, through an increase in claimed net operating losses to over $59 million (lines 27, 29); and reported tax due of only $388,736. Louisiana Health Service requested a refund of $1,058,831.[6]

11.   The main differences between the original and amended income tax returns for tax year 1991 are:

---

[5]Plaintiff argues that the first sentence is vague and misleading, because, where a subscriber had only one contract, BCBSLA claimed a tax loss as soon as the contract was terminated (doc. 48-2, ¶ 8).

[6]Plaintiff objects to the first sentence as vague, arguing that BCBSLA "had no decrease in taxable income before net operating losses and special deductions due to a corresponding decrease in the section 833 deduction [and] reported a decrease in alternative minimum tax from $1,425,412 to $368,963" (doc. 48-2, ¶ 10).

| Line item | Original Form 1120 | Amended Form 1120X |
|---|---|---|
| net losses from the sale of business property (line 9) | ($42,950) | ($1,999,259) |
| total income (line 11) | $62,068,660 | $60,112,351 |
| total deductions (lines 27, 29) | $103,516,327 | $119,653,411 |
| net operating losses (line 29c) | $41,451,719 | $59,545,112 |
| claimed losses from abandonment of intangible assets (Schedule 21) | ($46,914) | ($2,003,223) |
| tax due (line 31) | $1,447,532 | $388,736[7] |

12.    On its original corporate income tax return for 1992 Louisiana Health Service claimed net gain from the sale of business property of $925 (line 9); reported total income of over $77 million (line 11); claimed nearly $119 million in total deductions, $41 million of which were claimed net operating losses (lines 27, 29); and reported and paid tax due of $5,619,306.

13.    Plaintiff filed an application for tentative refund, which was disallowed in part. It then filed an amended income tax return for 1992. Louisiana Health Service claimed net losses from the sale of business property of $2.2 million (Schedule 1, line 9); added claimed losses from the purported cancellation, termination, or abandonment of the intangible assets in issue of nearly $2 million (Schedule 21); reported total income of $75 million (line 11); claimed an additional nearly $16 million in deductions, through an increase in claimed net operating losses to over $59 million (lines 27, 29); and reported tax due of only $611,549. Louisiana Health Service requested a refund of $2,326,076.[8]

---

[7]Plaintiff objects to this statement as vague, but merely suggests changes to two captions in the "Line Item" column: (1) "net losses from sale of business property (line 9)" is changed to "net gain or (loss) Form 4797 (line 9)"; and (2) "tax due (line 31)" is changed to "total tax (line 31/4)" (doc. 48-2, ¶ 11).

[8]Plaintiff objects to the third sentence as vague and argues that BCBSLA: (1) claimed losses, from cancellation, termination, or abandonment of the intangible assets at issue, of "nearly $2.2 million" instead of "nearly $2 million"; (2) reported a total income of "approximately $75 million"

14.    The main differences between the original and amended income tax returns for tax year 1992 are:

| Line item | Original Form 1120 | Amended Form 1120X |
|---|---|---|
| net losses from the sale of business property (line 9) | $925 | ($2,203,637) |
| total income (line 11) | $77,375,822 | $75,150,401 |
| total deductions (lines 27, 29) | $118,816,017 | $134,683,989 |
| net operating losses (line 29c) | $41,459,820 | $59,545,112 |
| claimed losses from abandonment of intangible assets (Schedule 21) | $0 | ($2,204,562) |
| tax due (line 31) | $5,619,306 | $611,549[9] |

15.    On its original corporate income tax return for **1993** Louisiana Health Service claimed net losses from the sale of business property of $7,588 (line 9); reported total income of nearly $80 million (line 11); claimed the same amount in total deductions (lines 27, 29); and reported and paid tax due of $5,469,370.

16.    On its amended income tax returns for **1993** Louisiana Health Service claimed an increase in net losses from the sale of business property to $3.5 million (p. 1, line 9); added claimed losses from the purported cancellation, termination, or abandonment of the intangible assets in issue of over $3

---

instead of "$76 million"; (3) had no decrease in taxable income before net operating losses and special deductions due to a corresponding decrease in the section 833 deduction; and (4) and reported a decrease in alternative minimum tax from $3,173,524 to $583,064.

[9]Plaintiff objects to this statement as vague, but merely suggests changes to four captions in the "Line Item" column: (1) "net losses from sale of business property (line 9)" is changed to "net gain or (loss) Form 4797 (line 9)"; (2) "net operating losses (line 29c)" is changed to "net operating losses (line 29(a))"; (3)"claimed losses from abandonment of intangible assets (Schedule 21)" is changed to "claimed losses (Form 4797, Part I, Line 2)"; and (4) "tax due (line 31)" is changed to "total tax (line 31/line4)" (doc. 48-2, ¶ 14).

million (Statement 42); reported total income of $76 million (line 11); claimed an additional $3.5 million in deductions, through a $12 million increase in its special deduction under Section 833(b) (page 2); and reported tax due of $4,756,291.  Louisiana Health Service requested a refund of $1,121,116.[10]

17.   The net differences between the original and amended income tax returns for tax year 1993 are:

| Line item | Original Form 1120 | Amended Form 1120X |
|---|---|---|
| net losses from the sale of business property (line 9) | ($7,588) | ($3,554,532) |
| total income (line 11) | $79,923,347 | $76,376,403 |
| total deductions (lines 27, 29) | $79,923,347 | $76,388,489 |
| net operating losses (line 29c) | $15,743,003 | $0 |
| claimed losses from abandonment of intangible assets (Form 4797 & Statement 42) | ($9,754) | ($3,556,698) |
| special deduction (§ 833) | $11,300,643 | $23,511,432 |
| tax due (line 31) | $5,469,370 | $4,756,291[11] |

18.   On its original corporate income tax return for **1994** Louisiana Health Service claimed net gain from the sale of business property of $409,984 (line 9); reported total income of nearly $65 million (line 11); claimed the same amount in deductions, including net operating losses of $11 million (lines 27, 29); and reported and paid tax due of $2,259,775.

---

[10]Plaintiff objects to the first sentence as vague, but admits that, "on its amended tax form," it: (1) claimed net losses of approximately $3.5 million, "including" losses from the cancellation, termination, or abandonment of the intangible assets in issue of over $3 million; reported a total income of "approximately $76 million; claimed "approximately" $3.5 million in deductions; and reported tax of $4,756,291 (doc. 48-2, ¶ 16).

[11]Plaintiff objects to this statement as vague, on essentially the same grounds as stated *supra*, note 9 (doc. 48-2, ¶ 17).

19.   On its amended income tax return for **1994** Louisiana Health Service claimed a net loss from the sale of business property of $454,402 (p. I line 9); added claimed losses from the purported cancellation, termination, or abandonment of the intangible assets in issue of over $800,000 (Statement 29); reported total income of $64 million (line 11); claimed the same amount in deductions (lines 27, 29 & Statements 5, 6), but a $10 million increase in its special deduction (p. 2); and reported tax due of $2,086,741.  Louisiana Health Service requested a refund of $188,820.[12]

20.   The main differences between the original and amended income tax returns for tax year 1994 are:

| Line item | Original Form 1120 | Amended Form 1120X |
|---|---|---|
| net losses from the sale of business property (line 9) | $409,984 | ($454,402) |
| total income (line 11) | $64,920,822 | $64,056,436 |
| total deductions (lines 27, 29) | $64,920,822 | $64,056,436 |
| net operating losses (line 29c) | $11,133,870 | $108,307 |
| claimed losses from abandonment of intangible assets (Form 4797 & Statement 29) | $0 | ($864,386) |
| special deduction (§ 833) | $0 | $10,165,396 |
| tax due (line 31) | $2,259,775 | $2,086,741[13] |

---

[12]Plaintiff objects to the first sentence as vague, but admits the net loss and that it included the $800,000 of lost intangible assets.  Plaintiff also admits reporting an "approximate" income of $64 million and claiming the same amount in deductions "including an approximately" $10 million increase in its special deduction and an "approximately" $11 million decrease in regulatr tax net operating losses, and a reported tax of $2,086,741 (doc. 48-2, ¶ 19).

[13]Plaintiff objects to this statement as vague, on essentially the same grounds as stated *supra*, notes 9 & 11 (doc. 48-2, ¶ 20).

21.   The IRS disallowed the plaintiff's claims for refund, and Louisiana Health Service timely filed this suit.

22.   The basis for the plaintiff's refund claims is that during the years 1987 to 1995, certain healthcare subscriber contracts, provider contracts, and employees which were in existence on January 1, 1987, terminated their contracts with Louisiana Health Service.[14]

23.   Relying on the "fresh start basis rule," enacted as part of the Tax Reform Act of 1986, the plaintiff claimed that its adjusted basis in each terminated contract or employee relationship, and therefore the amount of "loss" claimed, was equal to its fair market value as of January 1, 1987.

24.   At no time prior to filing its amended tax returns for the years 1991 through 1994 did the plaintiff claim a loss deduction for the purported cancellation, termination, or abandonment of subscriber contracts, provider contracts, or employee relationships.

25.   At no time between the filing of its original returns for 1987 through 1995 (none of which claimed loss deductions for healthcare coverage contracts, healthcare provider contracts, or employees) and the filing of its amended tax returns (each of which claimed loss deductions for the terminated healthcare coverage contracts, healthcare provider contracts, or employees) did the plaintiff request or secure the consent of the IRS to adopt a method of accounting that treats each subscriber contract, provider contract, and employee as a discreet asset.[15]

26.   The IRS disallowed plaintiff's claimed deductions.  Plaintiff timely filed this lawsuit on June 29, 2005.

(Doc. 47-2).

---

[14]Plaintiff objects to this statement as vague, but objects only to the semantics of the conclusion of law presented by the statement (doc. 48-2, ¶ 22).

[15]Plaintiff denies only that treating the subscriber contracts, provider contracts and employee relationships as assets amounts to a "method of accounting" (doc. 48-2, ¶ 25).

In support of its cross motion for summary judgment, plaintiff submits the following statement of facts that it claims are material to the motion:[16]

1.    BCBSLA's claims, with respect to its section 165 losses relating to healthcare coverage contracts, provider contracts, and employee relationships, were disallowed by the Internal Revenue Service.

2.    On January 1, 1987, BCBSLA held relationships with its customers embodied in its healthcare coverage contracts, relationships with providers embodied in its provider contracts, and relationships with its employees.

3.    In each of its taxable years, beginning in 1987, some of its healthcare coverage contracts, provider contracts, and employee relationships were cancelled or terminated.

4.    No relevant fact is stated in ¶ 4.[17]

5.    BCBSLA determined the individual January 1, 1987 value of each and every one of its healthcare coverage contracts, provider contracts, and employee relationships.[18]

6.    Dr. Mark Browne, one of the Government's experts in this case, purports to have determined the individual January 1, 1987 value of each and every one of the BCBSLA's healthcare coverage contracts.[19]

---

[16]As with defendant's statement of material facts, conclusions of law and obviously irrelevant facts submitted in connection with plaintiff's cross motion have been deleted so that the statement of material facts, and objections thereto, as reproduced herein, conform to the requirements of Uniform Local Rules 56.1 & 56.2.

[17]Paragraph 4, as submitted, consists entirely of a conclusion of law.  To the extent it referenced a valuation of intangible assets, any pertinent facts are reflected in ¶ 5.

[18]Defendant does not dispute that an expert for plaintiff has opined on his determination of the value of the healthcare coverage and provider contracts, and employee relationships.

[19]Defendant contends that the plaintiff's expert used aggregate data to arrive at the stated values.

7.  BCBSLA has determined the values of its healthcare coverage contracts, provider contracts and employee relationships based on various individual characteristics of each particular healthcare coverage contract, provider contract, and employer relationship.[20]

8.  On its amended tax returns, and in this litigation, BCBSLA claimed loss deductions, not depreciation deductions for the cancellation, abandonment or termination of its healthcare coverage contracts, provider contracts, and employee relationships.  In its amended tax returns, and in this litigation, BCBSLA claimed loss deductions, under Code section 165, for each lost healthcare coverage contract, provider contract, and employee relationship in the year of the loss.

9.

| Year | Healthcare Coverage Contracts | Provider Contracts | Employee Relationships |
|------|-------------------------------|--------------------|------------------------|
| 1987 | $4,295,177 | $115,036 | |
| 1988 | $6,588,649 | $ 50,504 | $252,231 |
| 1989 | $5,022,182 | $ 52,544 | |
| 1990 | $3,403,591 | $ 53,306 | |
| 1991 | $1,650,651 | $ 11,220 | $136,830 |
| 1992 | $1,550,675 | $ 78,039 | $161,088 |
| 1993 | $1,068,665 | $ 65,804 | $137,094 |
| 1994 | $1,080,472 | $ 72,687 | $124,752 |
| 1995 | $1,200,895 | $71,415 | $ 40,373[21] |

---

[20]Defendant disputes the values claimed and whether they are based on "unique characteristics."

[21]All values set forth in this table are disputed by defendant.

10. The losses shown in the preceding paragraph were determined by summing the values of each individual healthcare coverage contract, provider contract, and employee relationship lost in each of the years shown.[22]

11. Prior to filing its amended returns for the 1991 through 1994 tax years, in May 1996, BCBSLA did not reflect its healthcare coverage contracts, its provider contracts, or its employee relationships (or any of their January 1, 1987 values) as assets, either individually or in the aggregate, on any of BCBSLA's financial or tax accounting records.

12. Prior to assembling the data requested by Ernst & Young for purposes of preparing its valuation study in 1996, BCBSLA had not identified outside of its business records, its healthcare coverage contracts, provider contracts, or employee relationships that were in existence on January 1, 1987.[23]

13. BCBSLA has never capitalized the costs associated with creating healthcare coverage contracts, provider contracts, or employee relationships.

14. Each of BCBSLA's healthcare coverage contracts had ascertainable useful lives as of January 1, 1987.

15. For the reasons set forth *infra*, items 15 through 19 present no facts relevant to the motion for partial summary judgment.

(Doc. 49-3).

In support of its cross motion for summary judgment, and in opposition to the government's motion, plaintiff referenced the Declaration of Frederick H. Robinson. On March 19, 2009, defendant moved to strike the Robinson Declaration and its attached exhibits on the ground that the documents are inadmissible evidence of compromise and offers to compromise pursuant to Federal Rule of Evidence 408.

---

[22]Defendant does not controvert the method stated, but only the values set forth.

[23]Defendant objects to this paragraph insofar as the term, "business records," is not defined and therefore vague, but does not controvert the statement insofar as the referenced intangible assets were not previously treated as valuable, separate, and identifiable assets.

13

Defendant further argues that the Robinson Declaration and associated exhibits are irrelevant under Rules 401 and 402 of the Federal Rules of Evidence.

## LAW AND DISCUSSION

**Defendant's Motion to Strike**

Rule 402 of the Federal Rules of Evidence provides in pertinent part that "[e]vidence that is not relevant is not admissible."  Moreover:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed.R.Evid. 401.

The Robinson Declaration serves only to authenticate the exhibits attached to it.  Exhibit A to the Robinson Declaration consists of excerpts from a PricewaterhouseCoopers Report and is captioned, "Continuing Developments in the Taxation of Insurance Companies."  Exhibit B consists of a letter, dated May, 12, 2006, from the Internal Revenue Service to an unidentified individual at an unidentified Blue Cross Blue Shield Organization.  Exhibit C is captioned, "Closing Agreement on Final Determination Covering Specific Matters," and consists of a template used by the Internal Revenue Service and other Blue Cross Blue Shield organizations to assist them in arriving at the terms of a settlement agreement.

After a thorough review of the documents, the court concludes that neither the Robinson Declaration, nor any of the exhibits attached to it demonstrate any

14

tendency to make the existence of any fact that is of consequence to the determination of this action more probable or less probable than it would be in their absence. Thus, the documents are not relevant under Federal Rule of Evidence 401, and are inadmissible as evidence under Federal Rule of Evidence 402.

BCBSLA, however, argues that it offers the documents "in connection with the legal question of interpreting the statute" (doc. 54, pp. 1-2), but as the court notes *infra*, the statute is clear and unambiguous. Moreover, the documents at issue do not reflect congressional intent or judicial precedent, and Exhibit B specifically provides that: (1) the proposed settlement offer represents a compromise of issues; (2) the proposed settlement offer does not reflect the Internal Revenue Service's interpretation of the statute; and (3) "no statement contained herein shall be deemed to be an admission by the IRS or the Commissioner, and nothing herein shall preclude the IRS from asserting a position on the merits that is different from this settlement in contexts other than those concerning the civil tax liability of the parties" (doc. 49-4, Ex. B, pp. 12-13).

Though the documents need not be stricken from the record, for the foregoing reasons, the court concludes that the Robinson Declaration, and the exhibits thereto, will not be considered by the court in the course of this litigation.

15

**Motions for Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  In determining whether the movant is entitled to summary judgment, the court views facts in the light most favorable to the non-movant and draws all reasonable inferences in her favor. *Coleman v. Houston Independent School District*, 113, F.3d 528 (5th Cir. 1997). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2411, 91 L.Ed.2d 202 (1986).

*A. The Fresh Start Basis Rule*

The Fresh Start Basis Rule provides that:

> [F]or purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of such taxable year shall be treated as equal to its fair market value as of such day.

Tax Reform Act of 1986, § 1012(c)(3)(A)(ii).

The government argues that the Fresh Start Basis Rule should not apply to the losses claimed by BCBSLA because it only applies to gains or losses sustained upon the sale, exchange or other disposition of such property.  In support of that argument, the government offers excerpts from the statute's legislative history.

16

The language of the statute, however, is clear and unambiguous and does not limit "gain or loss" in any way.  In concluding that the statutory language giving rise to the Fresh Start Basis Rule is clear and unambiguous, this court joins the several other courts who have uniformly found the same.  See, *Capital Blue Cross v. C.I.R.*, 431 F.3d 117, 125 (3rd Cir. 2005); *Trigon Ins. Co. v. U.S.,* 215 F.Supp.2d 687, 699 (E.D.Va. 2002); *Highmark, Inc. v. U.S.*, 78 Fed.Cl. 146, 148 (Fed.Cl. 2007); *Hospital Services Ass'n. of Northeastern Pennsylvania*, 78 Fed.Cl. 434, 440 (Fed.Cl. 2007); *Capital Blue Cross v. C.I.R.*, 122 T.C. 224, 236 (U.S.Tax Ct. 2004).

The government argues that the courts in the above cases failed to consider whether their interpretation produced an absurd result in that it provides formerly tax exempt entities with advantages not available to others.  However, Congress enacted the Fresh Start Basis Rule to prevent previously untaxed entities "from being taxed on appreciation in the value of assets that had occurred in pre-1987 years when the organizations had not been subject to Federal income tax." *Capital Blue Cross*, 431 F.3d at 124 (citing *Capital Blue Cross*, 122 T.C. at 234 (citing H. Conf. Rep. 99-841, at II-350 (1986), 1986-3 C.B. (vol.4), 350)).

It is hardly surprising then,  that under the Fresh Start Basis Rule, previously exempt entities should receive different treatment than entities with established bases.  As the court in *Hospital Services Association* noted, "the Fresh Start Basis Rule provides a one-time tax advantage to BC/BS entities that can be viewed as smoothing the transition from tax-exempt to taxable entity status."  78 Fed.Cl. at

440.   Finding the reasoning of the court in *Hospital Services Association*,

persuasive, this court finds that the unambiguous language of the statute does not

lead to an absurd result or defeat the intent of Congress.  Therefore, the limitations

proposed by the government cannot be read into the statute.  See *Bob Jones Univ.*

*v. United States*, 461 U.S. 574, 586, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) ("The

court should look beyond the plain meaning of a statute only if the language is

ambiguous or a literal interpretation would frustrate the purpose behind the statute);

*Kornman & Associates, Inc. v. U.S.*, 527 F.3d 443, 451 (5th Cir. 2008) (citing *Lamie*

*v. United States Tr.*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004);

*Johnson v. Sawyer*, 120 F.3d 1307, 1319 (5th Cir. 1997) (A court may "deviate from

the literal language of a statute only if the plain language would lead to absurd

results or if such an interpretation would defeat the intent of Congress."); See also,

*W. Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 98-99, 111 S.Ct. 1138,

L.Ed.2d 68 (1991) (stating that, where statutory language is unambiguous, the

language cannot be expanded or contracted by statements made by legislators or

committees during the enactment process).

Accordingly, the court concludes that, on January 1, 1987, BCBSLA had an

adjusted basis, equal to the fair market value on that day, of any asset that it held.

B.  *Whether the Contracts and Employee Relationships are Assets*

The Third Circuit, in *Capital Blue Cross*, held that group health insurance

contracts were assets because each contract constituted the right to a continuing

stream of future payments.  431 F.3d at 125-26 (citing *Trigon*, 215 F.Supp.2d at 696; cf *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993) (holding that a newspaper subscription list was a depreciable asset); *Union Bankers Ins. Co. v. Comm'r*, 64 T.C. 807, 1975 WL 3176 (1975), *acq.*, Rev. Rul. 76-411, 1976-2 C.B. 208).  The court in *Trigon* concluded that healthcare provider contracts were assets subject to the Fresh Start Basis Rule because they produced value in that a provider network attracts subscribers to the company and ultimately saves subscribers and the insurance company money. 215 F.Supp. at 696.

The government has not seriously argued that the healthcare insurance contracts and healthcare provider contracts at issue in the present case are not assets and has repeatedly referred to them as assets in their submissions.  In light of the above decisions and the factual similarities between those cases and the present case, the court concludes that the healthcare insurance contracts and healthcare provider contracts at issue are assets for the purposes of the Fresh Start Basis Rule.

Applying the above rationale, the court concludes that BCBSLA's workforce is also an asset, because the workforce enables the company to administer its healthcare policies and process premiums, thus significantly enhancing its value.  See also *Caracci v. C.I.R.*, 456 F.3d 444 (5th Cir. 2006) (acknowledging that a company's workforce was an intangible asset).

19

C.  *The Mass Asset Rule and Valuation of Intangible Assets*

I.R.C. § 165(a) provides that "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." According to Treasury Regulations:

> A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained.

Treas.Reg. § 1.165-2(a).

BCBSLA claims the terminated healthcare subscriber contracts, healthcare coverage contracts and employee relationships as losses under I.R.C. § 165. The government argues that those intangible assets are not deductible under § 165 because they fall afoul of the mass asset rule.

The mass asset rule "limits a taxpayer's ability to deduct losses of some intangible assets that are treated as mere components of a larger indivisible asset." *Capital Blue Cross*, 431 F.3d at 126.  See also, *Skilken v. C.I.R.*, 420 F.2d 266, 268 (6th Cir. 1969) (stating that the mass asset rule also applies to I.R.C. § 165 deductions because mass assets present problems analogous to those presented by depreciation deductions); *Ralph W. Fullerton Co. v. U.S.*, 550 F.2d 548 (9th Cir.

20

1977) (applying the mass asset rule to determine whether deductions qualified under I.R.C. § 165).

   "[W]hat is apparently important to defeat the applicability of the mass-asset rule is that the contracts 'represent independent and uniquely valuable assets to the taxpayer.'" *Laird v. U.S.*, 556 F.2d 1224, 1233 (5th Cir. 1977) (quoting *KFOX, Inc. v. U.S.*, 510 F.2d 1365, 1378 (Ct.Cl. 1975)).  In addressing the burden imposed on the taxpayer to demonstrate that assets are independently valuable, the court in *Capital Blue Cross* stated:

> *Newark Morning Ledger* stands for the proposition that the taxpayer always bears the burden of proving that his lost intangible assets are susceptible of separate valuation.  A taxpayer who cannot carry that burden possesses a mass asset, and may not depreciate it or deduct losses of that asset.
>
> * * *
>
> But this heavy burden applies only to the taxpayer's obligation to prove that his intangible assets may be valued separately and with reasonable precision.  What we can derive from the foregoing is that, if the taxpayer can satisfy that burden, the process of proof changes. Once a court is satisfied that the intangible assets *may* be valued separately, its obligation is to find the correct value. The taxpayer and the Commissioner may submit their own proposed valuation, and dispute over the merits of each side's claims.

*Capital Blue Cross*, 431, F.3d at 130 (italics in original) (citing *Newark Morning Ledger*, 507 U.S. 546, 113 S.Ct. 1670).

   In concluding that losses arising from termination or cancellation of group health insurance subscriber contracts were deductible assets under the Fresh Start

Basis Rule and I.R.C. § 165, the court in *Capital Blue Cross*, found that the subscriber contracts did not constitute parts of a single individual asset, because each contract had a unique economic value based upon its claims history, rate structure, group size, and because they did not "self-regenerate."[24] *Id.* at 127.  That reasoning applies equally well to the healthcare subscriber contracts and healthcare provider contracts at issue in the present case, and produces the same result.  See also, *Trigon*, 215 F.Supp.2d at 706-713 (finding that healthcare subscriber and provider contracts were clearly identifiable and severable assets, to which fair market values could be assigned).

Though the government disputes the value of the losses claimed by BCBSLA, as well as the methods used by BCBSLA to arrive at the values, it has not argued that BCBSLA's healthcare provider and subscriber contracts are insusceptible of separate valuation.  Moreover, as noted by the court in *Trigon*, "[e]ven the Treasury Regulations establish that 'only in rare and extraordinary cases will property be considered to have no market value."  215 F.Supp.2d at 710 (*citing* Treas. Reg. §

---

[24]The court in *Capital Blue Cross* also stated that:

> the distinguishing feature of a true mass asset is its ability to be regenerated without substantial effort on the part of its owner, that is, its ability to "self-regenerate."  When an asset is maintained only by significant affirmative efforts to add new elements, these additions are most naturally understood as comprising something new and distinct from the original asset."

Capital Blue Cross, 431 F.3d at 126-127 (quoting Ithaca Industries, Inc., 17 F.3d 684, 688 (4th Cir. 1994)).

1.1001-1(a)).[25] The court finds no "rare and extraordinary" circumstances that would preclude separate valuation of the healthcare provider and subscriber contracts claimed as loss deductions by BCBSLA.

Therefore, BCBSLA has a theoretical right under the Fresh Start Basis Rule and I.R.C. § 165 to claim losses that it allegedly incurred when the healthcare subscriber and provider contracts were cancelled or terminated.  Contracts that are susceptible of market valuation, however, do not necessarily have actual market value.  Under the Fresh Start Basis Rule and I.R.C. § 165, for BCBSLA to sustain a loss upon the cancellation or termination of any contract, that contract must have had a positive free market value on January 1, 1987.  As noted by the court in *Capital Blue Cross*, the parties are free to submit their own valuations and dispute the merits of each side's claims, but evidence has not yet been submitted from which the court can determine the reliability or precision of the values claimed by BCBSLA.

Accordingly, the court concludes that a genuine issue of material fact precludes summary judgment with regard to BCBSLA's claims of losses sustained through the cancellation or termination of healthcare subscriber and provider contracts.

BCBSLA, unlike the plaintiffs in *Capital Blue Cross* and *Trigon*, also claims deductions, under the Fresh Start Basis Rule and I.R.C. § 165, for terminated

---

[25]Treas. Reg. 1.1001-1(a) provides in pertinent part, that "[t]he fair market value of property is a question of fact, but only in rare and extraordinary cases will property be considered to have no fair market value."

employee relationships.   The employee relationships, embodied in individual employment contracts, are similar to the healthcare provider and subscriber contracts in that they are terminated in much the same way, and because BCBSLA must act affirmatively to replace its terminated employee relationships.  However, under the holding of the Fifth Circuit in *Laird*, to avoid the bar presented by the mass asset rule, the contracts must also "represent independent and uniquely valuable assets to the taxpayer." 556 F.2d at 1233 (5th Cir. 1977).

Though other courts have found that healthcare subscriber and provider contracts can be individually valued for purposes of tax deductions, BCBSLA has not pointed to, and this court has not found, any case in which a court has concluded that individual employment relationships may be valued for loss deduction purposes. In addressing the requirement of separate valuation in *Capital Blue Cross*, however, the Third Circuit Court stated:

> We think that the Tax Court, and the Commissioner, misunderstood the requirements of separate valuation. As noted above, *Newark Morning Ledger*, 507 U.S. at 566, 113 S.Ct. 1670, requires that a taxpayer wishing to deduct his losses of intangible assets must show that those assets are susceptible of separate valuation. In many cases, this will be impossible, simply because the taxpayer really possesses a single indivisible asset whose whole is incommensurable with the sum of its parts, a single mass "composed of constantly fluctuating components." *Id.* at 567, 113 S.Ct. 1670. Thus, for instance, a company may not depreciate its "assembled work force," because new employees are constantly being trained to replace old ones, and because there is no meaningful way to assign distinct values to each member of this workforce. *Id.* at

> 560, 113 S.Ct. 1670. The value inheres in the "assembly"
> of the workforce, not in any one individual.

*Capital Blue Cross*, 431 F.3d at 133.

Though the court in *Capital Blue Cross* described valuation for depreciation purposes, its reasoning applies to § 165 deductions as well. The value in an assembled workforce is in the assembly, not in the individual employee relationships. That is particularly true where, as here, the employee relationships were terminable at-will on January 1, 1987. *See* (doc. 47-2, ¶ 4). At-will employees are free to terminate the employment relationship at any time and without having to assign any cause. *See* La.Civ.Code art. 2747. Where no predetermined limits are placed on the employment relationship, the obligations of the employee are subject not only to the changing influences of the employer, but of the employee as well. See, *Ithaca*, 17 F.3d at 690.

Therefore, if another party sought the services of an individual employee of BCBSLA, it would have no obligation to negotiate with, or even contact, BCBSLA. The prospective employer could contract directly with the employee, and BCBSLA would not be a party to the new contract. On the other hand, if the prospective employer did contract with BCBSLA for the employee's services, the employee would not be bound by the contract because his employment with BCBSLA would still be terminable at-will.

25

For the above reasons, the court finds that, unlike the healthcare subscriber and provider contracts, BCBSLA's individual employee relationships are not subject to fair market valuation as required by the Fresh Start Basis Rule, and, therefore, cannot serve as grounds for I.R.C. 165 deductions upon their termination.

D.   *Whether BCBSLA Made an Unauthorized Change in Its Accounting Method*

The government also contends that BCBSLA is not entitled to claim the deductions at issue because it made an unauthorized change in its method of accounting in order to claim them (doc. 47, p 26; doc. 52, pp. 14-20).

I.R.C. § 446(e) provides that "a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary."  Treasury Regulations specify that:

> a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. Consent must be secured whether or not such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder.

Treas. Reg. § 1.446-1(e)(2)(i).

The Treasury Regulations also provide that "a change in method of accounting does not include adjustment of any item of income or deduction which does not

26

involve the proper time for the inclusion of the item of income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(b).

The government argues that, by changing its method of accounting from a mass asset method to a § 165 method, BCBSLA altered the timing of the deductions from that applicable to depreciation. That argument, of course, is predicated on BCBSLA having previously accounted for the assets as mass assets. The government, however, has set forth no evidence from which the court can conclude that BCBSLA had previously treated the healthcare subscriber and provider contracts as mass assets. To the contrary, the undisputed facts establish that, prior to filing the amended returns, BCBSLA had not capitalized any of the intangible assets at issue, nor had it even accounted them as assets, individually or in the aggregate, in its financial or tax accounting records. *See* (doc. 49-3, ¶ 11,13).

Therefore, no genuine issue of fact precludes summary judgment regarding the government's position that BCBSLA made an unauthorized change in its accounting method, and the court concludes that BCBSLA made no such unauthorized change when it claimed the I.R.C. § 165 deductions at issue.

## CONCLUSION

For the foregoing reasons, the motion by defendant, United States of America, to strike evidence (doc. 51) is hereby **DENIED**;[26] the motion by defendant, United

---

[26]However, as noted *supra*, the Robinson Declaration and its attached exhibits will not be considered by the court during the course of this litigation.

States of America, for summary judgment (doc. 46), is hereby **GRANTED** insofar as it seeks summary judgment dismissing plaintiff's claims for refunds based on the termination or cancellation of its employee relationships and **DENIED** in all other respects; the cross motion for partial summary judgment by plaintiff, Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana (doc. 49), is hereby **DENIED** insofar as it seeks a finding that the Fresh Start Basis Rule applies to losses claimed upon termination of its individual employee relationships, and **GRANTED** in all other respects.[27]

Baton Rouge, Louisiana, June 3 0 , 2009.

RALPH E. TYSON
UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

---

[27]Though as noted *supra,* in order to be deductible under the Fresh Start Basis Rule and I.R.C. § 165, the individual contracts must be shown to have had actual fair market value on January 1, 1987.